William B. Franke, Appellant, *v.* Sarah A. Hewitt, Respondent.

*Oral negotiations and agreements, where both parties contemplated that they should be reduced to writing, held not to constitute a completed contract of lease — expenditures by the tenant in reliance upon the oral understanding.*

The owner of an apartment house, through her agent, made an oral agreement with one Franke, who was the previous owner of the house, and was then in possession, by which the agent agreed to lease the house to Franke for a term of ten and one-half months at a rental of $25,000 a year, payable on the fifteenth of every month, Franke to pay the taxes, Croton bills, running expenses and repairs, the taxes and Croton rates to be paid in advance by equal monthly payments equal to a *pro rata* of the preceding year's taxes, and to have the rebate upon such payments on the ensuing October first, and also to pay the fire insurance and to keep the building in good repair. After the parties had settled upon these terms the agent said to Franke: "Now, this is agreed between us, and you can go ahead, and I will, in the meantime, have the lease drawn up." Thereupon Franke made some repairs to the house, purchased certain supplies and proceeded to collect the rents, after doing which he received a letter from the agent which stated that the lease was ready for examination, and concluded: "In the meantime, I suppose you are collecting the rents and paying the help just the same as you did before you sold the property. It will be necessary, however, to keep a careful account so that we

may know how much is to be charged to you and how much to me." Subsequently, the parties met and the agent produced a written lease, the terms of, which did not conform to the oral agreement previously made. Franke refused to sign the lease, and the agent then said: "You need not go any further; this will end it," and told Franke to send him his bill of expenses.,

*Held*, that, in view of the fact that this was a letting of considerable magnitude and that large interests were involved, and that the terms settled upon in the oral negotiations were the barest outline of an agreement upon so important a subject, and were such matters as would be discussed and agreed upon as preliminary to any practical negotiations, and as they left untouched particulars which persons of the experience of these parties must have known would be certainly incorporated in any written lease, and as the evidence showed that Franke understood from the beginning that a written lease was to be made, there was no completed contract of lease;

That the fact that Franke had made certain expenditures in reliance upon the oral agreement did not change the situation.

APPEAL by the plaintiff, William B. Franke, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 11th day of June, 1900, upon the report of a referee.

*Lorenzo Ullo*, for the appellant.

*H. B. Closson*, for the respondent.

Judgment affirmed, with costs, on opinion of referee.

Present — VAN BRUNT, P. J., O'BRIEN, INGRAHAM, McLAUGHLIN and HATCH, JJ.

The following is the opinion of the referee:

JOSEPH F. DALY, Referee:

The action is brought to recover possession of premises alleged to have been forcibly entered by defendant and to be forcibly detained from plaintiff, who claims to have been in possession and to be entitled to possession by virtue of an oral lease of said premises made on or about November 25, 1899, by defendant to him. Treble damages are claimed under section 1669 of the Code. The defendant denies the alleged lease, and sets up that the only possession of plaintiff was as her agent, from which he was excluded upon her terminating such agency.

The facts concerning the disputed oral letting under which plaintiff claims are briefly as follows:

The premises in question, the "Monticello" apartment house on the northeast corner of West End avenue and Seventy-ninth street, were originally sold by the plaintiff to the defendant, and the deed was delivered November 16, 1899. On that date and previously Mr. Hewitt, who was acting for his wife, the purchaser, proposed to the plaintiff to remain in the premises as agent, but the plaintiff. declined and proposed instead to take a lease, which Mr. Hewitt on the last-named date said he would consider ; that he thought favorably of it. The plaintiff then remained in the building as agent of Mrs. Hewitt, to collect the rents and pay the wages of servants and account to her for the balance. A week later he saw Mr. Hewitt and asked if he had decided anything about the lease, and Mr. Hewitt said no, that he would decide very quickly, and on the twenty-fourth day of November came to the building, told plaintiff he had concluded to give him a lease from November fifteenth to October first of the ensuing year, if they could agree on terms. The plaintiff said that would suit him very well, because that was the time the leases expired, and if it were mutually agreeable they could make another lease for another term of years. The next day they met, settled upon a term of ten and one-half months, a rental of $25,000 a year, payable on the fifteenth of every month, the tenant to pay the taxes, Croton bills, running expenses and repairs; the taxes and Croton rates to be paid in advance by equal monthly payments equal to a *pro rata* of the preceding year's taxes, and plaintiff to have the rebate for payment on the ensuing October first; the tenant also to pay the fire insurance and to keep the building in good repair. Mr. Hewitt then said to the plaintiff, "Now, this is agreed between us, and you can go ahead, and I will, in the meantime, have the lease drawn up." This was on November 25, 1899.

The plaintiff, who had been taking in a supply of coal from day to day, now got a boatload of coal, an iron chimney cap for the boiler flue at a cost of twenty-five dollars, a gas range for one tenant at a cost of thirty dollars, two ornamental plants for the hall, a barrel of incandescent lamps, machinery supplies, renewed the tele phone contract, and redecorated the apartments of another tenant. He also made out bills to tenants and proceeded to collect the December rents.

On December second (Saturday) Mr. Hewitt wrote to the plaintiff that, according to promise, he had the lease ready for examination on the previous Tuesday and waited until Wednesday hoping for plaintiff to appear and execute it; that Thursday was Thanksgiving, and he returned to the city next day hoping to see plaintiff, who did not come; that he went to the Monticello that morning (Saturday) and the janitor told him plaintiff was not expected that day, hence he could only await plaintiff's coming to the writer's office on Monday next, where he would be at one P. M. with the lease ready for examination. The letter concludes: "In the meantime I suppose you are collecting the rents and paying the help just the same as you did before you sold the property. It will be necessary, however, to keep a careful account so that we may know how much is to be charged to you and how much to me."

This letter plaintiff did not get until the fifth (Tuesday), owing to his absence from the Monticello, and he immediately telephoned Mr. Hewitt to make another appointment, which was done, for the sixth. On that date plaintiff went to Mr. Hewitt's office and was shown a typewritten lease. He looked at the first two items of it and stated that it did not conform to their mutual agreement, in that it stated that the term was to commence on November fifteenth and run for one year, and the agreement was that it was to commence on the fifteenth of November and terminate on October 1, 1900, or ten and a half months. Mr. Hewitt said that after consulting with his lawyers he had come to the conclusion that it would not be advisable to make a lease for ten months and a half; that that might cause a great many complications. Plaintiff said he did not care what his lawyers advised him, it was not in accordance with their agreement. Then Mr. Hewitt asked what was the other item and the plaintiff said that the lease stated that the rent is to be paid on the first of every month, and the agreement was that the rent should be paid on the fifteenth of the month. Mr. Hewitt said that was only an oversight of his lawyers. The plaintiff then said he would not sign any lease that differed in any way from their mutual agreement and laid the lease down on the table. Mr. Hewitt took it up and said: "You need not go any further, this will end it," and plaintiff left, Mr. Hewitt telling him to send his bill of expenses and he would pay it, to which plaintiff replied, "This will be settled

on the terms of our agreement and not otherwise." The next day Mr. Hewitt took possession of the premises, installed an agent and excluded the plaintiff.

On this state of facts, which is the substance of the plaintiff's uncontradicted testimony as to the transaction between him and Mr. Hewitt, he claims to have established a valid oral lease. of the premises in question for ten and one-half months from November 15, 1899. The defendant, on the other hand, contends upon the facts that neither of the parties contemplated that they should be bound to anything until all the terms of a written lease had been agreed upon and a written lease had been executed, such terms as were discussed and settled between them being only some of the many terms necessary in a written lease.

It is not to be denied that where a tenancy can be created by an oral agreement and the parties have agreed upon all the terms, nothing being left to be done except to put them in writing, the letting would be complete though the stipulated lease were never signed. (*Wilbur* v. *Collin*, 4 App. Div. 418.) If all the conditions of the letting are definitely agreed upon, the failure to execute a written lease, though one had been contemplated by the parties, would not prevent the consummation of the contract, particularly where the tenant had been admitted to possession. (*William Wicke Co.* v. *Kaldenberg Mfg. Co.*, 21 Misc. Rep. 79.) The rule is the same where the negotiations are in writing and a formal written contract is stipulated for into which their agreement is to be reduced; if the minds of the parties meet upon all the essentials, the agreement is complete though the contemplated written contract was never made. Should either party attempt to assert any material condition not agreed to, the other would have the right to fall back upon the original agreement. (*Sanders* v. *Pottlitzer B. F. Co.*, 144 N. Y. 209.) A contract to make a written contract, the terms of which are mutually understood and agreed upon, is as valid and obligatory as the written contract would be if executed; but this only applies where the terms are in all respects definitely understood and agreed upon, and a part of the mutual understanding is that a written contract embodying those terms should be drawn. (*Pratt* v. *Hudson River R. R. Co.*, 21 N. Y. 308.)

But, as was said in *Wilbur* v. *Collin* (*supra*), " of course, if the

minds of the parties did not meet as to all the essential particulars of the contract, there was no leasing. Of course, if a written contract was subsequently to be drawn up and it was left until then to agree upon some of its terms and conditions, there was no leasing." So where the parties had negotiated for a lease for a less term than a year, and the rent and date of the termination of the tenancy had been fixed, but no date for the commencement of the term, and it had been agreed that a lease was to be prepared, which was not done, it was held that there was no lease and no agreement for a lease. (*Sourwine* v. *Truscott,* 17 Hun, 432.) And where negotiations for a renewal of a lease terminated in an oral agreement that if the landlord would make certain repairs and supply an additional room the tenant would take the apartment for another year, and the repairs were made and the additional apartment tendered, it was held that as nothing was said as to rent, and there could be no inference that the rent with an additional apartment was to be the same as before, the agreement was incomplete and there was no renewal. (*Steinhardt* v. *Buel,* 1 Misc. Rep. 295.) Where the terms of a letting were agreed upon as mentioned, but there was a stipulation for a written lease, and a lease was presented for signature containing stipulations not discussed between the parties, it was held that there was no agreement, the evidence showing that the contract was not to be binding until the execution of a written lease, as it was conceded that the tenant would not be admitted to occupy the premises until the lease was signed.

It is the general rule that if the parties understand the parol agreement to be executory, and that a written lease is to be prepared and executed, and the negotiations look to the final execution of such an instrument according to the terms considered, there is no letting until the writing be executed. (*Fleming* v. *Ryan,* 10 Misc. Rep. 420.) It is settled that where the parties intend that there shall be a formal written contract, the negotiations between them cannot be regarded as an absolute final contract. (*Commercial Telegram Co.* v. *Smith,* 15 N. Y. St. Repr. 19; S. C., 47 Hun, 494; *Sidney Glass Works* v. *Barnes & Co.,* 86 Hun, 378.) And it is said that the rule as to leases is that though the most proper form of words be used to describe and pass a present lease for years, yet, if upon the whole deed three appears no such intent, and it is only preparatory and relative to

a future lease to be made, notwithstanding the words of the demise appear to be *in præsenti*, the writing is only to operate as an agreement for a lease and not as the lease itself. (*Jackson* v. *Myers*, 3 Johns. 388.) Whether the instrument is to be construed as a lease or only an agreement for a lease depends upon the intention of the parties as collected from the whole instrument. The law will rather do violence to the words than break through the intent of the parties. So held in the case of a writing for the lease of a house to be altered and improved, " to have and to hold  *  *  *  from the day that the said store and cellar shall be altered and improved," which was held not to be a lease, but only an agreement for one. (*Jackson* v. *Delacroix*, 2 Wend. 433.)

When the question is one of intent, the authorities have always recognized that the circumstance that the parties decided to have a formal written agreement is strong evidence that the oral agreement was not understood or intended to be binding. (*Bryant* v. *Ondrak*, 87 Hun, 477, citing *Brown* v. *New York Central R. R. Co.*, 44 N. Y. 79.) Where a written agreement as to a letting is definite as to certain essentials, but provides for a writing to contain " usual covenants and agreements as between landlord and tenant where the premises are situate," it was held not to be a lease with a covenant for further assurance, but as conveying no present interest. (*Morgan* v. *Bissell*, 3 Taunt. 65.) In that case Lord MANSFIELD observes : " It would be a very wise rule that wherever one person is about to grant and another to take a lease, until the lease was actually executed no interest at law should pass. As to the question what are usual covenants it is an endless source of litigation."

And where an agreement in writing fixed the term of a letting, the rent, time of payment, time of commencement of the term and provided for the making of a good and sufficient lease for twenty-one years to contain certain specified covenants and " all other usual and reasonable covenants," it was held not a lease but an agreement for a future tenancy. (*Brashier* v. *Jackson*, 6 M. & W. 549.)

In the case of a written agreement to give a three years' lease " in the same manner that my other leases are drawn, to correspond with the present lease when it expires," it was held that there was no lease present or future, but merely an agreement for a lease. (*Becker* v. *De Forest*, 1 Sweeny, 528.) And where a written prop-

osition for a lease provided that the rent was to commence on the first of April and that the form and covenants of the lease and other details could be thereafter arranged, and the proposal was accepted and the lessor offered to put the other party in possession on that date, but the formal lease was not executed until July, and the tenant did not take possession in April, but May, it was held that there was no tenancy in April. (*Brown* v. *New York Central R. R. Co.*, *supra*.)

In applying the rule that unless the lease in all its terms is agreed upon, there is no binding contract until the contemplated writing is executed, and that where any of the terms of the letting remain to be settled and any conditions to be contained in the written lease are left indefinite to be fixed when the lease should be prepared, there is no contract binding on the parties at law, it is of no consequence that the party claiming to enforce the oral agreement would have been willing to accept such an agreement as the other party might have prepared, or that the parties might have presumed that a lease would be prepared which would be agreed to and executed. "Unless the lease, in all its terms, was agreed upon, then there was no binding contract which could be enforced at law. * * * If any of the conditions to be contained in the lease were left indefinite and to be fixed only when the lease should be prepared, there was no such contract as was binding on the parties at law. Whatever may have been the probability that the parties would not ultimately disagree upon the form of the lease, or however unimportant to the lessees, the stipulations omitted to be specified might be regarded." (*Sourwine* v. *Truscott*, *supra*, citing *Booth* v. *Bierce*, 38 N. Y. 463; *Cutts* v. *Guild*, 57 id. 229, 234; *Fullerton* v. *Dalton*, 58 Barb. 236, 239.)

As indicated by the foregoing authoritative declarations of the law, the question to be determined in this case, upon the facts, is, whether the parties intended that the stipulations as to which they concurred in their oral negotiations, should constitute a completed contract for the letting and hiring of the premises in question, or were simply preparatory to the making of a written lease fully covering the subject and which should be the sole agreement.

On the part of the plaintiff it is contended that the stipulations agreed upon orally embraced all the essentials of a perfect letting;

that as nothing was said about any other terms or conditions, and as the lessor's agent said, " Now, this is agreed between us and you can go ahead," which the lessee proceeded to do, it was evident that the parties intended a lease then and there, the plaintiff thus being vested with immediate possession as lessee as distinguished from his previous possession as agent, and that the additional statement of Mr. Hewitt, " and I will, in the meantime, have the lease drawn up," assented to by plaintiff, indicated nothing more than to have a written record of an agreement already made and carried into effect. Is this contention supported by the evidence?

In arriving at the intention of the parties we must consider the circumstances as well as their language. This was a letting of considerable magnitude and large interests were involved. The terms settled upon in the oral negotiations were the barest outline of an agreement upon so important a subject. They were such matters as would be discussed and agreed upon as preliminary to any practical negotiations, substantially merely, and the term and the rental, and they left untouched particulars which persons of the experience of these parties must have known would be certainly incorporated in any written lease. It is only necessary to suggest the usual, if not indispensable, covenants against assigning the lease or term, as to the use of the premises, as to the obligations of the parties in case of the total or partial destruction of the premises by fire, as to admitting persons to view the premises towards the end of the term for the purpose of letting or selling, and many other customary covenants. None of these was mentioned between Mr. Hewitt and Mr. Franke, yet it cannot be inferred from their silence that they expected them to be omitted from the written lease. Nor is it reasonable to suppose that any person would expect the letting of a large property would be concluded upon the settling of three or four of the many questions involved in it, and with less formality than would be observed in letting any of the twenty-seven apartments contained in the building. It was, indeed, to be expected in the case of such a property that stipulations appropriate to such a tenancy with numerous sub-tenancies would have to be considered. All of these considerations, it is reasonable to assume, entered into the consideration of the parties when they looked forward to the making of a formal written lease.

While nothing was said about a written lease until the parties had arrived at an understanding upon the first terms discussed, namely, the term and the rental, the mode of payment and whether it should include the taxes and water rents, insurance and repairs, it was nevertheless understood by plaintiff from the beginning that a written lease was to be made. He testifies that he did not expect that when he got a lease it would be a verbal one. This is the strongest evidence that it was not understood by plaintiff that the lease was effected by the mere words that passed between him and Mr. Hewitt. What was understood by Mr. Hewitt appears very clearly from his letter announcing that the lease was ready for examination and execution, and stating that he supposed that the plaintiff was going on to collect the rents and pay the help as before the sale.

The plaintiff testifies further that he always looked forward to having a written lease, though nothing had been said about it; that he had assumed that they would finally make a written lease to have everything put down on the paper as to its terms; that he supposed Mr. Hewitt assumed that a written lease would be made because it was customary in such transactions, and it would be unusual not to have a written lease. This testimony supports the inference that the plaintiff understood there was to be no agreement until the negotiations were finally concluded by a written lease; that there were matters to be discussed and adjusted up to the time that the lease was executed, and that the instrument which was to contain " everything " — that is, all the customary covenants usual in written leases and all the appropriate terms of such a letting — was to embody the ultimate agreement of the parties and be the sole authoritative evidence of their contract.

We are not without express authority for holding that after such negotiations as were had in this case, the intention to have a written lease warrants the inference that it should contain such provisions as are customary in such instruments and not merely the subjects which the parties happened to discuss and settle before it was drawn up. In *Arnold* v. *Rothschild's Sons Co.* (37 App. Div. 564), which was the case of an alleged oral lease, there was an agreement of the parties upon the term of the letting, the rent and the mode of payment, as in the present case, and an approval by the principal

of the agent's negotiation, and it was claimed, as it is here, that a lease was thus effected, although it was understood that a formal written lease was to be prepared, but the court said: "As every one knows, a formal lease contains many stipulations which are not found in the contract growing out of the conversations which Tanenbaum (the agent) had with these parties. All those stipulations have an important effect upon the rights of the respective parties; and when it was understood that such a formal lease should be executed it would be necessary that the preliminary conversations should be quite full and explicit as to the terms of the contract before the parties should be held to a completed contract in the absence of what they had agreed should be the final evidence of such a bargain."

It seems quite clear from the evidence that the parties here intended that there should be a formal writing evidencing their agreement; that until it was executed there should be no completed contract, and that it was part of their intention that the written lease should contain such provisions as were usual and customary in such instruments, and provisions not yet discussed between them and the consideration of which should be necessarily postponed until the document was prepared. That being the case, it follows, from the authorities, that there was no completed contract of leasing or for a lease entered into between the plaintiff and defendant, the oral negotiations between them not having embraced all the terms of the contemplated contract.

It is urged that the plaintiff, in reliance upon the oral agreement to which he testifies, and considering the letting as definitely settled, went on to make certain expenditures upon the premises as lessee. But this consideration, if warranted by the evidence, may also be disposed of upon authority. The contract being for a written lease, the terms of which were left undetermined, the plaintiff assumed the risk of expenditures made in expectation of its being eventually carried out. The circumstances can have no significance in determining the legal relation of the parties; if advanced on any theory of estoppel the proposition "is without shadow of support either in principle or authority." (*Steinhardt v. Buel, supra*, citing *White* v. *Ashton*, 51 N. Y. 280.)

The motion to dismiss the complaint is granted.