pointed out requiring further testimony, or if additional evidence should be deemed essential by the commissioners, to enable them to determine the true value of the property sought to be condemned, they undoubtedly have the right to order further hearings, and the taking of more testimony. If it had been made to appear to the court that the commissioners had been guilty of an abuse of their discretion in that regard, the report might be sent back for further consideration of the questions involved, but I have been unable to discover any such injurious action on their part; neither has it been made to appear that there has been any fraud or irregularity, or any erroneous principle adopted in arriving at their determination, or that the awards are grossly inadequate or excessive. No grounds have, therefore, been shown for interference by this court. In re Brook Ave., 8 App. Div. 294, 40 N. Y. Supp. 949; In re Boston Road, 27 Hun, 409; In re Central Park Com'rs, 51 Barb. 277.

As before stated, the hearings covered a period of over two years, and no limit was placed upon the number or character of the witnesses to be called. Moreover, the commissioners (one learned in the law), it is undisputed, are all men of large experience in real-estate transactions, great familiarity with property in the vicinity of the lands condemned, of unbiased mind, disinterested, of known integrity, and are entitled to respect and confidence. It is apparent that a new hearing would simply result in the introduction of more testimony from expert witnesses, whose opinions would continue to show a wide divergence, and the awards made would then, as now, necessarily depend equally as much upon the personal judgment of the commissioners as upon such testimony, and all parties would be put to needless and unnecessary expense, without compensating results. For the reasons stated, the report of the commissioners must be confirmed.

Report of commissioners confirmed. ·

(56 App. Div. 497.)

## FRANKE v. HEWITT.

(Supreme Court, Appellate Division, First Department. December 31, 1900.)

LANDLORD AND TENANT—ORAL LEASE—AGREEMENT TO EXECUTE—LEASE.

    Plaintiff and defendant orally agreed that plaintiff should rent certain premises of defendant for a specified period, at a certain rent, payable at certain specified times, and that he should pay the expenses, insurance, and keep the building in repair, and defendant then told plaintiff, who was in possession of the building, to go ahead, and that he would have a lease prepared. Plaintiff expended considerable money in repairs, etc., and afterwards refused to sign the lease prepared by defendant, because it did not comply with the oral agreement, and he was ejected by defendant. *Held*, that the oral agreement did not constitute an oral lease, which would entitle the plaintiff to recover possession of the property, since the agreement contemplated the execution of a written lease.

Appeal from judgment on report of referee.

Action by William B. Franke against Sarah A. Hewitt to recover possession of certain real property. From a judgment in favor of the defendant, entered on a referee's report dismissing the complaint, plaintiff appeals. Affirmed.

## The following is the opinion of DALY, Referee:

"The action is brought to recover possession of premises alleged to have been forcibly entered by defendant, and to be forcibly detained from plaintiff, who claims to have been in possession, and to be entitled to possession, by virtue of an oral lease of said premises made on or about November 25, 1899, by defendant to him. Treble damages are claimed under section 1669 of the Code. The defendant denies the alleged lease, and sets up that the only possession of plaintiff was as her agent, from which he was excluded upon her terminating such agency. The facts concerning the disputed oral letting under which plaintiff claims are, briefly, as follows:

"The premises in question, the Monticello apartment house, on the northeast corner of West End avenue and Seventy-Ninth street, were originally sold by the plaintiff to the defendant, and the deed was delivered November 16, 1899. On that date, and previously, Mr. Hewitt, who was acting for his wife, the purchaser, proposed to the plaintiff to remain in the premises as agent, but the plaintiff declined, and proposed instead to take a lease, which Mr. Hewitt on the last-named date said he would consider; that he thought favorably of it. The plaintiff then remained in the building as agent of Mrs. Hewitt, to collect the rents and pay the wages of servants, and account to her for the balance. A week later he saw Mr. Hewitt, and asked if he had decided anything about the lease, and Mr. Hewitt said 'No,' that he would decide very quickly, and on the 24th day of November came to the building, and told plaintiff he had concluded to give him a lease from November 15th to October 1st of the ensuing year, if they could agree on terms. The plaintiff said that would suit him very well, because that was the time the leases expired, and if it were mutually agreeable they could make another lease for another term of years. The next day they met, settled upon a term of 10½ months, a rental of $25,000 a year, payable on the 15th of every month, the tenant to pay the taxes, Croton bills, running expenses, and repairs; the taxes and Croton rates to be paid in advance by equal monthly payments equal to a pro rata of the preceding year's taxes, and plaintiff to have the rebate for payment on the ensuing October 1st; the tenant also to pay the fire insurance, and to keep the building in good repair. Mr. Hewitt then said to the plaintiff, 'Now, this is agreed between us, and you can go ahead, and I will, in the meantime, have the lease drawn up.' This was on November 25, 1899. The plaintiff, who had been taking in a supply of coal from day to day, now got a boat load of coal, an iron chimney cap for the boiler flue at a cost of $25, a gas range for one tenant at a cost of $30, two ornamental plants for the hall, a barrel of incandescent lamps, machinery supplies, renewed the telephone contract, and redecorated the apartments of another tenant. He also made out bills to tenants, and proceeded to collect the December rents. On December 2d (Saturday) Mr. Hewitt wrote to the plaintiff that, according to promise, he had the lease ready for examination on the previous Tuesday, and waited until Wednesday hoping for plaintiff to appear and execute it; that Thursday was Thanksgiving, and he returned to the city next day, hoping to see plaintiff, who did not come; that he went to the Monticello that morning (Saturday), and the janitor told him plaintiff was not expected that day; hence he could only await plaintiff's coming to the writer's office on Monday next, where he would be at 1 p. m., with the lease ready for examination. The letter concludes: 'In the meantime, I suppose you are collecting the rents and paying the help just the same as you did before you sold the property. It will be necessary, however, to keep a careful account, so that we may know how much is to be charged to you and how much to me.' This letter plaintiff did not get until the 5th (Tuesday), owing to his absence from the Monticello, and he immediately telephoned Mr. Hewitt to make another appointment, which was done, for the 6th. On that date plaintiff went to Mr. Hewitt's office, and was shown a typewritten lease. He looked at the first two items of it, and stated that it did not conform to their mutual agreement, in that it stated that the term was to commence on November 15th and run for one year, and the agreement was that it was to commence on the 15th of November and terminate on October 1, 1900, or 10½ months. Mr. Hewitt said that, after consulting with his

lawyers, he had come to the conclusion that it would not be advisable to make
a lease for 10½ months; that that might cause a great many complications.
Plaintiff said he did not care what his lawyers advised him, it was not in
accordance with their agreement. Then Mr. Hewitt asked what was the
other item, and the plaintiff said that the lease stated that the rent is to be
paid on the 1st of every month, and the agreement was that the rent should
be paid on the 15th of the month. Mr. Hewitt said that was only an over-
sight of his lawyers. The plaintiff then said he would not sign any lease that
differed in any way from their mutual agreement, and laid the lease down on
the table. Mr. Hewitt took it up and said, 'You need not go any further;
this will end it;' and plaintiff left, Mr. Hewitt telling him to send his bill of
expenses, and he would pay it; to which plaintiff replied, 'This will be settled
on the terms of our agreement and not otherwise.' The next day Mr. Hewitt
took possession of the premises, installed an agent, and excluded the plaintiff.

"On this state of facts, which is the substance of the plaintiff's uncontra-
dicted testimony as to the transaction between him and Mr. Hewitt, he claims
to have established a valid oral lease of the premises in question for 10½
months from November 15, 1899. The defendant, on the other hand, contends,
upon the facts, that neither of the parties contemplated that they should be
bound to anything until all the terms of a written lease had been agreed upon,
and a written lease had been executed, such terms as were discussed and set-
tled between them being only some of the many terms necessary in a written
lease.

"It is not to be denied that where a tenancy can be created by an oral agree-
ment, and the parties have agreed upon all the terms, nothing being left to
be done except to put them in writing, the letting would be complete though
the stipulated lease were never signed. Wilbur v. Collin, 4 App. Div. 418, 38
N. Y. Supp. 848. If all the conditions of the letting are definitely agreed
upon, the failure to execute a written lease, though one had been contem-
plated by the parties, would not prevent the consummation of the contract,
particularly where the tenant had been admitted to possession. William
Wicke Co. v. Kaldenberg Mfg. Co., 21 Misc. Rep. 79, 46 N. Y. Supp. 937.
The rule is the same where the negotiations are in writing, and a formal
written contract is stipulated for into which their agreement is to be reduced.
If the minds of the parties meet upon all the essentials, the agreement is
complete though the contemplated written contract was never made. Should
either party attempt to assert any material condition not agreed to, the other
would have the right to fall back upon the original agreement. Sanders v.
Fruit Co., 144 N. Y. 209, 39 N. E. 75. A contract to make a written contract,
the terms of which are mutually understood and agreed upon, is as valid and
obligatory as the written contract would be if executed; but this only applies
where the terms are in all respects definitely understood and agreed upon,
and a part of the mutual understanding is that a written contract embodying
those terms should be drawn. Pratt v. Railroad Co., 21 N. Y. 308.

"But, as was said in Wilbur v. Collin, supra: 'Of course, if the minds of
the parties did not meet as to all the essential particulars of the contract,
there was no leasing. Of course, if a written contract was subsequently to be
drawn up, and it was left until then to agree upon some of its terms and
conditions, there was no leasing.' So where the parties had negotiated for a
lease for a less term than a year, and the rent and date of the termination of
the tenancy had been fixed, but no date for the commencement of the term,
and it had been agreed that a lease was to be prepared, which was not done,
it was held that there was no lease and no agreement for a lease. Sourwine
v. Truscott, 17 Hun, 432. And where negotiations for a renewal of a lease
terminated in an oral agreement that, if the landlord would make certain re-
pairs and supply an additional room, the tenant would take the apartment
for another year, and the repairs were made, and the additional apartment
tendered, it was held that as nothing was said as to rent, and there could be
no inference that the rent with an additional apartment was to be the same
as before, the agreement was incomplete, and there was no renewal. Stein-
hardt v. Buel, 1 Misc. Rep. 295, 20 N. Y. Supp. 706. Where the terms of a
letting were agreed upon as mentioned, but there was a stipulation for a
written lease, and a lease was presented for signature containing stipulations

not discussed between the parties, it was held that there was no agreement, the evidence showing that the contract was not to be binding until the execution of a written lease, as it was conceded that the tenant would not be admitted to occupy the premises until the lease was signed.

"It is the general rule that if the parties understood the parol agreement to be executory, and that a written lease is to be prepared and executed, and the negotiations look to the final execution of such an instrument according to the terms considered, there is no letting until the writing be executed. Fleming v. Ryan, 10 Misc. Rep. 420, 31 N. Y. Supp. 129. It is settled that, where the parties intend that there shall be a formal written contract, the negotiations between them cannot be regarded as an absolute final contract. Telegram Co. v. Smith, 15 N. Y. St. Rep. 19; Id., 47 Hun, 494; Glass Works v. Barnes, 86 Hun, 378, 33 N. Y. Supp. 508. And it is said that the rule as to leases is that, though the most proper form of words be used to describe and pass a present lease for years, yet if, upon the whole deed, there appears no such intent, and it is only preparatory and relative to a future lease to be made, notwithstanding the words of the demise appear to be in præsenti, the writing is only to operate as an agreement for a lease, and not as the lease itself. Jackson v. Myers, 3 Johns. 388. Whether the instrument is to be construed as a lease, or only an agreement for a lease, depends upon the intention of the parties as collected from the whole instrument. The law will rather do violence to the words than break through the intent of the parties. So held in the case of a writing for the lease of a house to be altered and improved, 'to have and to hold  *  *  *  from the day that the said store and cellar shall be altered and improved,' which was held not to be a lease, but only an agreement for one. Jackson v. Delacroix, 2 Wend. 433.

"When the question is one of intent, the authorities have always recognized that the circumstance that the parties decided to have a formal written agreement is strong evidence that the oral agreement was not understood or intended to be binding. Bryant v. Ondrak, 87 Hun, 477, 34 N. Y. Supp. 384, citing Brown v. Railroad, 44 N. Y. 79. Where a written agreement as to a letting is definite as to certain essentials, but provides for a writing to contain 'usual covenants and agreements as between landlord and tenant where the premises are situate,' it was held not to be a lease with a covenant for further assurance, but as conveying no present interest. Morgan v. Bissell, 3 Taunt. 65. In that case Lord Mansfield observes: 'It would be a very wise rule that, wherever one person is about to grant and another to take a lease, until the lease was actually executed no interest at law should pass. As to the question what are usual covenants, it is an endless source of litigation.' And where an agreement in writing fixed the term of a letting, the rent, time of payment, time of commencement of the term, and provided for the making of a good and sufficient lease for 21 years, to contain certain specified covenants, and 'all other usual and reasonable covenants,' it was held not a lease, but an agreement for a future tenancy. Brashier v. Jackson, 6 Mees. & W. 549. In the case of a written agreement to give a three-years lease 'in the same manner that my other leases are drawn, to correspond with the present lease when it expires,' it was held that there was no lease, present or future, but merely an agreement for a lease. Becker v. De Forest, 1 Sweeny, 528. And where a written proposition for a lease provided that the rent was to commence on the 1st of April, and that the form and covenants of the lease and other details could be thereafter arranged, and the proposal was accepted, and the lessor offered to put the other party in possession on that date, but the formal lease was not executed until July, and the tenant did not take possession in April, but May, it was held that there was no tenancy in April. Brown v. Railroad, supra.

"In applying the rule that, unless the lease in all its terms is agreed upon, there is no binding contract until the contemplated writing is executed, and that where any of the terms of the letting remain to be settled, and any conditions to be contained in the written lease are left indefinite, to be fixed when the lease should be prepared, there is no contract binding on the parties at law, it is of no consequence that the party claiming to enforce the oral agreement would have been willing to accept such an agreement as the other party might have prepared, or that the parties might have presumed that a lease

would be prepared which would be agreed to and executed. 'Unless the lease, in all its terms, was agreed upon, then there was no binding contract which could be enforced at law. * * * If any of the conditions to be contained in the lease were left indefinite, and to be fixed only when the lease should be prepared, there was no such contract as was binding on the parties at law. Whatever may have been the probability that the parties would not ultimately disagree upon the form of the lease, or however unimportant to the lessees, the stipulations omitted to be specified might be regarded.' Sourwine v. Truscott, supra, citing Booth v. Bierce, 38 N. Y. 463; Cutts v. Guild, 57 N. Y. 229, 234; Fullerton v. Dalton, 58 Barb. 236, 239.

"As indicated by the foregoing authoritative declarations of the law, the question to be determined in this case, upon the facts, is whether the parties intended that the stipulations as to which they concurred in their oral negotiations should constitute a completed contract for the letting and hiring of the premises in question, or were simply preparatory to the making of a written lease fully covering the subject, and which should be the sole agreement. On the part of the plaintiff, it is contended that the stipulations agreed upon orally embraced all the essentials of a perfect letting; that as nothing was said about any other terms or conditions, and as the lessor's agent said, 'Now, this is agreed between us, and you can go ahead,' which the lessee proceeded to do, it was evident that the parties intended a lease then and there, the plaintiff thus being vested with immediate possession as lessee, as distinguished from his previous possession as agent; and that the additional statement of Mr. Hewitt, 'and I will, in the meantime, have the lease drawn up,' assented to by plaintiff, indicated nothing more than to have a written record of an agreement already made and carried into effect. Is this contention supported by the evidence?

"In arriving at the intention of the parties, we must consider the circumstances as well as their language. This was a letting of considerable magnitude, and large interests were involved. The terms settled upon in the oral negotiations were the barest outline of an agreement upon so important a subject. They were such matters as would be discussed and agreed upon as preliminary to any practical negotiations, substantially merely, and the term and the rental, and they left untouched particulars which persons of the experience of these parties must have known would be certainly incorporated in any written lease. It is only necessary to suggest the usual, if not indispensable, covenants against assigning the lease or term, as to the use of the premises, as to the obligations of the parties in case of the total or partial destruction of the premises by fire, as to admitting persons to view the premises towards the end of the term for the purpose of letting or selling, and many other customary covenants. None of these was mentioned between Mr. Hewitt and Mr. Franke, yet it cannot be inferred from their silence that they expected them to be omitted from the written lease. Nor is it reasonable to suppose that any person would expect the letting of a large property would be concluded upon the settling of three or four of the many questions involved in it, and with less formality than would be observed in letting any of the 27 apartments contained in the building. It was, indeed, to be expected in the case of such a property that stipulations appropriate to such a tenancy, with numerous subtenancies, would have to be considered. All of these considerations, it is reasonable to assume, entered into the consideration of the parties when they looked forward to the making of a formal written lease.

"While nothing was said about a written lease until the parties had arrived at an understanding upon the first terms discussed, namely, the term and the rental, the mode of payment, and whether it should include the taxes and water rents, insurance and repairs, it was nevertheless understood by plaintiff from the beginning that a written lease was to be made. He testifies that he did not expect that when he got a lease it would be a verbal one. This is the strongest evidence that it was not understood by plaintiff that the lease was effected by the mere words that passed between him and Mr. Hewitt. What was understood by Mr. Hewitt appears very clearly from his letter announcing that the lease was ready for examination and execution, and stating that he supposed that the plaintiff was going on to collect the rents and pay the help as before the sale.

"The plaintiff testifies, further, that he always looked forward to having a written lease, though nothing had been said about it; that he had assumed that they would finally make a written lease, to have everything put down on the paper as to its terms; that he supposed Mr. Hewitt assumed that a written lease would be made because it was customary in such transactions, and it would be unusual not to have a written lease. This testimony supports the inference that the plaintiff understood there was to be no agreement until the negotiations were finally concluded by a written lease; that there were matters to be discussed and adjusted up to the time that the lease was executed, and that the instrument which was to contain 'everything'—that is, all the customary covenants usual in written leases and all the appropriate terms of such a letting—was to embody the ultimate agreement of the parties and be the sole authoritative evidence of their contract. We are not without express authority for holding that, after such negotiations as were had in this case, the intention to have a written lease warrants the inference that it should contain such provisions as are customary in such instruments, and not merely the subjects which the parties happened to discuss and settle before it was drawn up. In Arnold v. R. Rothschild's Sons Co., 37 App. Div. 564, 56 N. Y. Supp. 161, which was the case of an alleged oral lease, there was an agreement of the parties upon the term of the letting, the rent and the mode of payment, as in the present case, and an approval by the principal of the agent's negotiation, and it was claimed, as it is here, that a lease was thus effected, although it was understood that a formal written lease was to be prepared, but the court said: 'As every one knows, a formal lease contains many stipulations which are not found in the contract. growing out of the conversations which Tanenbaum (the agent) had with these parties. All those stipulations have an important effect upon the rights of the respective parties; and, when it was understood that such a formal lease should be executed, it would be necessary that the preliminary conversations should be quite full and explicit as to the terms of the contract before the parties should be held to a completed contract, in the absence of what they had agreed should be the final evidence of such a bargain.'

"It seems quite clear from the evidence that the parties here intended that there should be a formal writing evidencing their agreement; that until it was executed there should be no completed contract; and that it was part of their intention that the written lease should contain such provisions as were usual and customary in such instruments, and provisions not yet discussed between them, and the consideration of which should be necessarily postponed until the document was prepared. That being the case, it follows, from the authorities, that there was no completed contract of leasing or for a lease entered into between the plaintiff and defendant, the oral negotiations between them not having embraced all the terms of the contemplated contract.

"It is urged that the plaintiff, in reliance upon the oral agreement to which he testifies, and considering the letting as definitely settled, went on to make certain expenditures upon the premises as lessee. But this consideration, if warranted by the evidence, may also be disposed of upon authority. The contract being for a written lease, the terms of which were left undetermined, the plaintiff assumed the risk of expenditures made in expectation of its being eventually carried out. The circumstances can have no significance in determining the legal relation of the parties. If advanced on any theory of estoppel, the proposition 'is without shadow of support either in principle or authority.' Steinhardt v. Buel, supra, citing White v. Ashton, 51 N. Y. 280.

"The motion to dismiss the complaint is granted."

Argued before VAN BRUNT, P. J., and O'BRIEN, INGRAHAM, McLAUGHLIN, and HATCH, JJ.

Lorenzo Ullo, for appellant.
H. B. Closson, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of referee.