FLORENCE JOSEPHINE FREADRICH GOODWIN, APPELLEE, V. LORENCE R. FREADRICH, EXECUTOR, ET AL., APPELLANTS.

280 N. W. 917

FILED JULY 2, 1938. No. 30192.

*Peterson & Devoe,* for appellants.

*Field, Ricketts & Ricketts* and *Ross D. Netherton,* contra.

Heard before GOSS, C. J., EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ., and FALLOON, District Judge.

EBERLY, J.

This is a suit in equity by Florence Josephine Freadrich Goodwin, a daughter of Charles H. Freadrich, deceased, against Luella Freadrich, widow of the deceased, Lorence R. Freadrich in his individual capacity, and as executor of the estate of Charles H. Freadrich, deceased, and as trustee of trust created by the terms thereof, O. R. Martin, trustee, and Claire J. Freadrich, defendants.

The plaintiff seeks to specifically enforce an oral contract alleged to have been entered into for her benefit on or about the 15th day of January, 1912, by and between her father, Charles H. Freadrich, and Edith Freadrich, her mother, whereby, in consideration of the oral promises of Edith

Freadrich, said Charles H. Freadrich orally promised that he would, at his death, leave his entire estate to the plaintiff, his daughter, then of the age of about 7 years, excepting only the amount his wife, Luella Thorne Freadrich, whom he had married May 23, 1911, would receive by law. Plaintiff alleges full performance of the oral agreements made by and on the part of Edith Freadrich, but that on January 14, 1933, Charles H. Freadrich made and executed his will which was not in accordance with the oral agreement of January 15, 1912, and operated as a breach thereof; that he subsequently died; that on June 5, 1935, such will was duly proved, allowed and admitted to probate by the county court of Lancaster county, Nebraska, as the last will of the deceased; that the defendants named are beneficiaries under this will.

All defendants answered, and issues were joined. The statute of frauds was one of the defenses pleaded.

A trial in the district court resulted in findings and judgment generally for plaintiff, and for the specific enforcement of the oral contract as to all defendants, except the defendant Lorence R. Freadrich. The trial court, as to Lorence R. Freadrich, entered a decree finding generally on the issues joined in his favor, and, as to him, against plaintiff.

All defendants appeal, and plaintiff prosecutes a cross-appeal so far as the decree entered is adverse to her claims.

The appeal and cross-appeal bring the issues to this tribunal for trial *de novo*. Upon this record, by statute, we are required to "reach an independent conclusion as to what finding or findings are required under the pleadings and all the evidence, without reference to the conclusion reached in the district court *or the fact that there may be some evidence in support thereof*." (Italics supplied.) Comp. St. 1929, sec. 20-1925. See, also, *Ericson v. Nebraska-Iowa Farm Investment Co.*, 134 Neb. 391, 278 N. W. 841.

The record discloses that Edith Waterman, now Edith Shogren, and Charles H. Freadrich were married in April, 1903, at Lincoln, Nebraska. Florence Josephine Goodwin,

*nee* Freadrich, was born of this marriage on January 19, 1905. On October 6, 1908, in an action commenced in the district court for Lancaster county by Edith Freadrich, a decree of divorce was entered in her favor awarding the custody of plaintiff to her, but providing that Charles H. Freadrich should have the right to visit the child and to have the child visit him at suitable and convenient times to be agreed upon between the parties.

This decree of divorce also provided:

"5. That said plaintiff will not permanently remove said child from out of the jurisdiction of this court, but is only permitted to take the child when upon a visit and not for the purpose of thwarting the jurisdiction of this court over the child and is enjoined therefrom."

Paragraph 6 of this decree further provided that Charles H. Freadrich should pay to Edith Freadrich for the support and maintenance of the child the sum of $12.50 a month for the period of two years, and $15 a month for the next three years thereafter, and also, in the event that the parties to the suit could not then agree on the amount to be paid, the court reserved jurisdiction to fix the sum of support money and maintenance according to the means and the ability of the defendant.

On June 11, 1909, a further action was instituted by Charles H. Freadrich in the district court for Lancaster county against Edith Freadrich and her father, Joseph H. Waterman, and his wife, alleging, among other matters, that Edith Freadrich had left the child with Joseph H. Waterman and wife, who were about to leave the city of Lincoln and take the child out of the state and out of the jurisdiction of the court, and praying that such removal be enjoined. On June 16, 1909, a decree was entered in said cause whereby the first decree of divorce entered in the case of Edith Freadrich v. Charles H. Freadrich was modified so that the custody of said child was awarded to Joseph H. Waterman, and the remaining parts of the decree were to remain unchanged. These proceedings left the permanent injunction embodied in the decree of October 6,

1908, against the permanent removal of the child by her mother, Edith Freadrich, from out of the jurisdiction of the district court for Lancaster county in full force and effect; continued the provisions for the payment of support and maintenance moneys as also provided therein, and also the provision thereof retaining jurisdiction by that court for the purpose of determining future payments if such were required.

The record, however, discloses that Florence Josephine Freadrich was permanently removed by her grandfather, Joseph H. Waterman, to Galesburg, Illinois, in contravention of the decree of the district court for Lancaster county, in June, 1910. It also appears that after this removal there was no attempt to enforce the payments provided by this decree, though so far as disclosed by the evidence before us the decree was never satisfied of record.

After the granting of the divorce, Edith Freadrich sought and found employment outside of the state of Nebraska. In April, 1910, she married a Mr. Speilman in St. Joseph, Missouri. They made the city of Chicago their family home. There, for a few months, they were joined by plaintiff in this case. Mr. Speilman was soon taken sick with tuberculosis. He died in the latter part of the year 1911. During this year Edith Speilman, formerly Freadrich, had been employed in Detroit, Michigan. The evidence discloses that she terminated her employment in Detroit and came to Galesburg, Illinois, to be with her daughter on the latter's birthday. Mrs. Edith Shogren, formerly Freadrich, furnishes the sole testimony with reference to the actual making of the contract here in suit. She testifies wholly unaided by any contemporaneous written record or memorandum, substantially, as follows: That Charles H. Freadrich had written her mother then living at Galesburg, a letter, which was not preserved; that subsequently he came to Galesburg, Illinois, and that they had a conference "just before my daughter's birthday in January, 1912;" that her best recollection is that this conference occurred in the second week in January, on the 12th or 14th of that month, at the

Union Hotel in Galesburg, Illinois; that after a talk over the telephone with Freadrich just before mid-day, she went to the Union Hotel in company with her daughter, plaintiff in this case, and a conference extending from four to four and a half hours followed; that her daughter was present during the entire conversation. However, no other witness testifies to Charles H. Freadrich's presence in Galesburg, or his absence from his home at Lincoln, at this time.

The following is a summary of the testimony of this witness as to the conversation that occurred between her and Freadrich relating to the alleged making of an oral contract, upon which the present action is founded, viz.:

"Well, I asked him if it would be possible for him to help me with Josephine at that time, I was in very bad circumstances. * * * Q. Tell just what you said and he said. * * * A. And he said, 'No,' and I said, 'Why can't you, aren't you doing better in your business?' and he said, 'Yes,' but he had other obligations; and I said, 'Well,' I said, 'there is some back money that you have owed and that I could use very nicely now,' and I asked him if he couldn't see that he could help me some, but he said, 'No,' and he volunteered this then: 'If you will take care of Josephine until I get going well in my business, then we will make an agreement between us,' and I said, 'Just what kind of an agreement?' I wanted him to state what kind it would be. I said, 'Just what kind of an agreement?' and he said, 'Well, if you will waive all claims in regard to anything you might feel I owe you and if you will waive all claim of bringing any action in any court against me for any future support for her I will make her my heir. There can't be any other children and Josephine will be my heir to three-fourths of my estate; according to the law of Nebraska I have to give my widow, if I should die, one-fourth of the estate and the rest will go to my child, and there can't be any other children and she will inherit that.' * * * Q. You mentioned anything that might be due you at that time. Do you have any definite recollection how much had accrued to you and remained unpaid on child support at that time? A. About

$750, I would judge. Q. Now, was there any discussion about the education of the child? A. Yes; I was to assume that full responsibility and give her to the best of my ability her care and her education; I didn't assume a college education, I just said I would do the very best I could. Q. What, if anything, did he ask you to do in respect to that, the education of the child? A. He didn't specify any particular education I should give her, he just expected me to assume full responsibility for her. Q. I am not asking what he expected, give us his words? A. His words were if I would assume that part he would make her his heir, that would be my part of the obligation and that his would be the other. Q. What discussion, if any, was there as to his then financial condition? A. He said his business had been progressing, but that he needed his money to put in his business as he went along and that he wasn't in a position to help. Q. Was anything said that you recall as to his probable future worth? A. Oh, yes; he said he expected at some time he was going to have a big business, he said he wanted to expand and he believed he had a wonderful future; he said, 'I am not going to stand still, I am going to progress,' and if he did Josephine would benefit by it,— Florence, he called her. * * * Q. Was anything said in the discussion at all about the right of visiting the child or anything of that kind? A. Yes. Q. Tell the court just as fully and accurately as you can what was said. A. He asked me if he might have access to the child any time she was old enough to come to see him or if he was going through where I was and wanted to come to see her if I would object to that, and I said, 'Certainly not, you would have access to her at any time.' * * * Q. In the early part of the conversation was there any discussion of doing anything for your parents or his own parents? A. His own parents but not mine. Q. What was that? A. He said his father and mother were getting older all the time and that they were not in real good circumstances and that was part of his obligations, he felt he should look after his father and mother. Q. Did you make any comment on that? A. I

told him he most certainly should, his mother should come ahead of every one. * * * Q. At the conclusion, just before you broke off the negotiations with him at that time how did you leave things, that is, what was said between you and him as to these various points you have mentioned? * * * A. Well, I said to him I would live up to what he asked me to do, that I would try the best I could, if my health would permit, to care for her, clothe her and educate her, and he said in return,—do you want me to quote again? A. Yes? A. He said there could be no children with him and she would be his only child heir and that she would come in at his death to three-fourths of his estate and his wife one-fourth. Q. Was anything said about a will? A. Nothing was said about a will, I asked him if he would put it in black and white. Q. What did he say? A. He said, 'No;' that he thought his word was sufficient."

This constitutes the sole direct evidence of the making of this alleged oral agreement or the terms thereof, though the witness testifies that her daughter, the plaintiff herein, was present during the entire conference, and that the daughter then made up with her father and sat upon his lap, and spent the entire conference time in his presence. The plaintiff testifies that she has no recollection whatever of this incident, of seeing and meeting her father at Galesburg, Illinois, in January, 1912. The record contains a letter written by plaintiff on December 27, 1912, to her father, thanking him for Christmas presents just received. A large number of her letters written subsequently also appear in the record. In none of these is to be found any reference to meeting her father at Galesburg, Illinois, in 1912. Indeed, in a letter addressed to her father under date of August 22, 1917, written in her own handwriting, plaintiff says, in part: "You see I don't know you and wouldn't of known you on the street and you can't blame me for being so when I haven't seen you for eight years." The "eight years" carries the time back to the year of the conclusion of the divorce litigation at Lincoln, Nebraska.

As we now proceed to discuss the evidence, we are here

met with the preliminary objection that Edith Shogren was incompetent to testify as to alleged transactions and conversations between her and Charles H. Freadrich, now deceased, during his lifetime. The transactions and conversations testified to by this witness occurred after the marriage relations that once existed between these parties had been severed. She is not a party to the present litigation and her undisputed evidence is that she will not gain by the result thereof if her testimony given prevails. Under these circumstances, her competency as a witness is not subject to challenge under the terms of our disqualifying statutes. *Nelson v. Nelson,* 133 Neb. 458, 275 N. W. 829; *In re Estate of Tilton,* 129 Neb. 872, 263 N. W. 217.

Nevertheless, it is not to be forgotten that this testimony, coming from a witness not disinterested, related to an extended conversation that is alleged to have taken place more than 25 years prior to the day on which the evidence was received in the trial court. No note or memorandum of the meeting appears to have been reduced to writing by either of the parties said to be present. At best we have to contend with the frailties of the human memory. On this general subject Felix Arnold, a psychologist of established reputation, has said that one-half of all the new matter presented to the average mind is forgotten after the first half-hour; two-thirds within nine hours; three-quarters within six days, and four-fifths of all the new matter presented to the average mind is utterly forgotten after one month. Without making a definite application in the instant case, it must be admitted, viewing the record before us as an entirety, that the witnesses for the plaintiff as to important matters connected with the merits of this case have, to a large degree, established the general truth of the conclusion quoted. So, too, the general nature of the evidence before us invokes consideration of the following principles announced in *Johnson v. Kern,* 117 Neb. 536, 546, 225 N. W. 38, viz.:

" 'Courts of justice lend a very unwilling ear to statements of what dead men have said.' *Lea v. Polk County*

*Copper Co.,* 21 How. (U. S.) 493. 'Unsupported testimony of a single person as to a conversation between himself and a deceased person is regarded as the weakest kind of evidence.' *Lippert v. Pacific Sugar Corporation,* 33 Cal. App. 198. Where statements were made in loose, casual or random conversation the supreme court of Iowa has announced the conclusion that: 'No species of testimony is more dangerous, or received with greater caution.' *Cooper v. Skeel,* 14 Ia. 578, 581. As applicable to the subject of proof of admissions of declarants, Corpus Juris, after a discussion of the obvious weakness of this class of testimony, in general, continues as follows: 'Exposed to all the infirmities just mentioned and to the further objection that it is impossible, in most cases, to convict the witness of perjury if his testimony is wilfully false, testimony as to the oral statements of deceased persons is therefore regarded as the weakest kind of evidence and subjected to the closest scrutiny.' 22 C. J. 291, sec. 319. In principle our own authorities are in substantial accord with the rule thus expressed. *Overlander v. Ware,* 102 Neb. 216; *Williams v. Miles,* 68 Neb. 463; *Clark v. Turner,* 50 Neb. 290."

The controlling evidence quoted must also be considered in the light of the circumstances that then surrounded the participating parties. In the month of January, 1912, Charles H. Freadrich, in partnership with his brother, was conducting a retail grocery business in Lincoln, Nebraska. This business venture was commenced in 1906 and continued as a partnership until 1929. On January 1, 1912, the net worth of Freadrich Brothers was approximately $4,000. Charles H. Freadrich then had no assets other than his interest in the partnership, which was a half interest. On the judicial records of Lancaster county, Nebraska, appears an unsatisfied judgment in favor of Edith Freadrich on which no payments had been made after June, 1910, and as to which plaintiff's mother estimated that $750 remained unsatisfied, and as to which no attempts had been made to enforce it after removal of plaintiff from Lancaster county. In January, 1912, Edith Freadrich was

temporarily unemployed, owned no property, and was dependent on her daily labor to support herself and child. The relations between herself and her late husband, at least prior to the divorce proceedings and continuing to the second week in January, 1912, had not been friendly. She knew at the time of this alleged interview that he had married Luella Thorne on May 23, 1911. Her attitude towards his present widow, who is a party defendant herein, her husband's second wife, may be judged from a letter written by her and mailed at Chicago, Illinois, addressed to Charles H. Freadrich, on June 29, 1920. The following is quoted therefrom, viz.:

"You no doubt are surprised to see I am willing for Josephine to come to Lincoln and I hope you will understand what it means to me; but I want you to see I am big enough to forget everything and let her come. There is just one condition I will make, and that is that she is not to *see* or be asked to go anywhere where she will meet your wife. If your wife is home that means Josephine is not to go to your house or for your wife to come to your mother's while Josephine is there. When you write me and give me your word as to this, then I will be contented to let her go & if I feel right about it she will enjoy herself better. Write me as soon as possible so we can make our plans."

Evaluated in the manner suggested, we find the proof in this case wholly insufficient to sustain plaintiff's cause of action. Even accepting the quoted evidence at face value, it does not establish the necessary meeting of minds, nor the definiteness and certainty essential to the validity of a binding contract, and neither does it establish a sufficiency of performance to remove the bar of the statute of frauds. At the outset, it will be noted that in the first part of the conference all present contributions by Freadrich to his divorced wife for the benefit of his child are absolutely refused. He had "other obligations" that prevented, and besides, though his business had been progressing, he needed his money to put in his business and he was not in a position to help. The number of these "other obligations" then exist-

ing, and the amounts involved, are, with but one exception, not specified or defined. The evidence we are considering contains the following: "He said his father and mother were getting older all the time and that they were not in real good circumstances and that was a part of his obligations. * * * I told him he most certainly should, his mother should come ahead of every one." There is nothing in the evidence that relates to how, when, and by what method Freadrich intended to perform and satisfy any of these "other obligations," including the part he owed to his father and mother, which was then regarded by him to be superior and preeminent to the claims of his child. The affirmative statement on this subject by the sole witness testifying is that the making of a will was not mentioned or discussed during the interview. Under these circumstances, the controlling evidence contains no limitation or restriction on the deceased's discretion in dealing with the performance and fulfilment of the "other obligations," and whether they were to be discharged *inter vivos* or provided for by a last will was clearly reserved for his sole determination. But nothing in the entire record negatives the purpose and intent of plaintiff's father that ultimately these "other obligations" should each be fully carried out and discharged. So far as his obligation to his parents was concerned, that determination was exercised and that obligation performed, by his last will, executed January 14, 1933, wherein a trust fund of $20,000 was created, the income of which was made payable to his parents or the survivor of them, as long as they should live.

It also appears in this alleged conversation that Freadrich was well aware that his wife's statutory share in his estate, after his death, could not be diminished by any testamentary provision he might make. In fact, the proof we are now considering contains special reference by the now deceased to the laws of Nebraska defining and governing the rights of a wife in a decedent's estate, as well as children's rights of inheritance therein. This clearly appears in the last statement attributed to Freadrich, at the

close of the first and only conference alleged to have occurred, viz.:

"He said there could be no children with him, and she would be his only child heir and that she would come in at his death to three-fourths of his estate and his wife one-fourth."

The reference here is plainly to the then controlling sections of the Nebraska statutes, which, in view of the fact that the only property then owned by Freadrich was personal property, were sections 4903, 4901, 1522, and 1527, Cobbey's Annotated Statutes of Nebraska for 1911. These provide for and define the rights of a "child heir."

Section 4903, so far as applicable to the situation as existing in 1912, provided: "When any person shall die possessed of any personal estate or of any right or interest therein, not lawfully disposed of by his last will, the same shall be applied and distributed as follows: First. The surviving husband or wife, if any, and if there be no surviving husband or wife, then the child or children, if any, of the deceased shall be allowed all the wearing apparel and ornaments and household furniture of the deceased, and all the property and articles that was or were exempt to the deceased at the time of his or her death, from levy or sale upon execution or attachment, and other personal property, to be selected by her, him or them, not exceeding Two Hundred (200) Dollars in value, and this allowance shall be made to such surviving husband or wife or child or children, if any, as well when he or she or they shall receive provision made in the will of the deceased as when the deceased dies intestate."

By the second subdivision, provision was made for such reasonable allowance as the county judge may deem necessary to the husband or wife and children constituting the family of the deceased, etc.

Further, "Sixth. The residue, if any, of the personal estate shall be distributed in the same proportions to the same persons as prescribed for the descent and distribution of real estate."

Section 4901, which is applicable where husband or wife survives, provides, first, that the property referred to in the sixth subdivision, above referred to, "shall descend, subject," etc., in the following manner: First, one-fourth part to the wife surviving. Fifth, (in effect) the remainder of the said property shall descend in equal shares to his children.

As applied to the instant case, these statutory provisions would limit the right of inheritance of plaintiff to three-fourths of the estate remaining undisposed of by will, if the ancestor should die testate, and after making the deductions provided for in the controlling statutes. And it may be stated in passing, "It is commonly said that the existing statutes and the settled law of the land at the time a contract is made becomes a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention." 12 Am. Jur., 769, sec. 240. See, also, *McWilliams v. Griffin*, 132 Neb. 753, 273 N. W. 209, 110 A. L. R. 1039; *Watts v. Long*, 116 Neb. 656, 218 N. W. 410, 59 A. L. R. 728.

With the terms of the Nebraska statutes considered as part of this claimed oral agreement here sought to be enforced, it is obvious that "three-fourths of my estate" which plaintiff claims under her father's oral promise she should receive upon his death must be deemed limited and diminished by the statutory rights of Luella Freadrich, and also by the terms of the statute defining rights of children to inheritance in the estate of a deceased ancestor.

For, assuming that Charles H. Freadrich had died intestate on January 15, 1912, leaving no indebtedness (eliminating all consideration as to how his "other obligations" were to be satisfied), the $2,000 in personal property then constituting his entire assets would have been disposed of substantially as follows: (1) $250, estimated cost of probate; (2) $600, allowance to the widow (estimated); (3) all articles of wearing apparel and ornaments and household furniture of deceased to descend to widow; (4) $500,

personal property exempt from execution, to descend to widow; (5) $200, other personal property to be selected by survivor; total $1,550; and thus $500 only would remain subject to the claims of the second wife and plaintiff, conceding arguendo full validity to the claimed contract. In passing it may be noted that deceased provided insurance policies on his life payable to plaintiff in the sum of twelve thousand dollars, and also a policy on his life in the sum of ten thousand dollars in which she is a contingent beneficiary.

Therefore, in the instant case, where, in the claimed oral conversation, the ancestor declared the existence of certain preeminent "other obligations" which were then in part identified and in principle agreed to, but the true extent and amounts of which were not then made known, and where, in a later part of the same conversation, without in any manner indicating a change of position or intention with reference to such "other obligations," an oral promise is made by such ancestor that his child shall receive three-fourths of his estate *as his only child heir,* such promise must be construed as a part of the entire conversation, and in connection with the Nebraska statute relating to intestate succession expressly limiting the right of inheritance to property "not disposed of by will." So construed, the subsequent execution of a will by the ancestor, certainly so far as the same may relate to the satisfaction of the "other obligations," constitutes no violation of the claimed oral promises made by him.

Even if the portion of the conversation as to the existence of "other obligations" be deemed wholly repugnant to the portion of the conversation wherein the deceased is said to have promised that plaintiff, at his death, would come in for three-fourths of his estate, so that the two clauses cannot stand, still this fact would not change the conclusion above announced. Even in the case of a completed contract in writing, the controlling rule of construction is, viz.: "Where two clauses are so repugnant that they cannot stand together, the first will be retained and the second re-

jected, unless the inconsistency is so great as to avoid the instrument for uncertainty, and this rule is the more readily applied where the instrument is apparently carelessly drawn." 13 C. J. 536. See, also, 12 Am. Jur., 778, sec. 243.

It follows that, if the conversation detailed in the proof under consideration is to be given legal effect, the "other obligations" may not be ignored.

An obligation is ordinarily defined as that which a person is bound to do or forbear; any duty imposed by law, promise or contract, by the relations of society, or by courtesy, kindness, etc.

In the instant case the deceased regarded these "other obligations" as superior to the claims of his child. He, Freadrich, refused to contribute to his child's support because of these then existing obligations. Their amount, in the aggregate, was not stated, and their identity and nature, excepting the obligation in reference to his parents, was not made known.

Under these circumstances, the conversation alleged to have occurred at Galesburg, Illinois, in January, 1912, lacks the certainty and definiteness to constitute a binding present contract. It is no more than a partial contract to make a contract in the future. The rule is that, unless an agreement to make a future contract is definite and certain upon all subjects to be embraced, it is nugatory. An agreement that the parties will in the future make such contract as they may then agree upon amounts to nothing. To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as a result of future negotiations. An agreement which on its face leaves some essential terms to future agreement is incapable of enforcement. *Bonicamp v. Starbuck,* 25 Okla. 483, 106 Pac. 839, L. R. A. 1917B, 141; *Irish v. Pulliam,* 32 Neb. 24, 48 N. W. 963.

Likewise, the circumstance that the parties intended a subsequent agreement to be made is strong evidence that they did not intend the previous negotiations to amount

to an agreement. *Sherry v. Proal,* 131 App. Div. 774, 116 N. Y. Supp. 234; *Franke v. Hewitt,* 56 App. Div. 497, 68 N. Y. Supp. 968; *Ridgway v. Wharton,* 6 H. L. Cas. (Eng.) 268; *Lyman v. Robinson,* 14 Allen (Mass.) 242; *Brown v. New York Central R. Co.,* 44 N. Y. 79; *Bryant v. Ondrak,* 87 Hun, 477, 34 N. Y. Supp. 384.

It follows, therefore, in view of the surrounding circumstances, that the conversation testified to by plaintiff's mother as having been had at the alleged conference between Charles H. Freadrich and this witness in January, 1912, would not constitute a valid contract, but, because of its indefiniteness and uncertainty as to the terms of agreement, if ever made, would be absolutely void and unenforceable.

But, in so determining the legal effect of plaintiff's evidence, we do not find, and must not be understood as determining, that any meeting between plaintiff's mother and Charles H. Freadrich ever occurred at Galesburg, Illinois, in January, 1912, or that any agreement whatever, partial or incomplete, was then entered into at that time and place.

The intrinsic weakness of plaintiff's proof is to be found in the fact that the evidence involved is occupied wholly in detailing an extended conversation had by plaintiff's mother with Charles H. Freadrich, who was deceased at the time of this trial. It comes entirely from the mouth of a witness having a great natural interest in the result of this litigation, who is wholly without contemporary corroboration. This witness swears that plaintiff, then a child of seven, was present during the entire conference and there "made up with her father." The plaintiff swears that she has no recollection whatever of the transaction, or of the fact of an agreement having been made. We know from plaintiff's own letter written August 22, 1917, that she then had no recollection of having seen her father since 1909.

The sole witness testifying to the Galesburg meeting fixes the time thereof as follows: She testifies that she knows the time of this conference; that Mr. Speilman, her

husband, who died in the latter part of 1911, had departed this life shortly prior thereto; that she was then a widow, and that she married Mr. Shogren in March of 1912. Again she swears that she is positive it occurred just before her daughter's birthday on January 19. Then, again, she testified that to the best of her recollection it occurred on January 12 or 14, 1912. On cross-examination, with reference to the time of this Galesburg meeting, she stated: "I know it was before her (the daughter's) birthday. * *. * I can't pin myself down." It might have been "from four, five, six days" before her daughter's birthday. January 12 and 14, or at most, as fixed by the actual scope of this witness' testimony, January 12, 13, 14, and 15 are the crucial dates.

A "cash and credit statement book," being a written record of the business transactions of the firm of Freadrich Brothers, covering the entire year of 1912 is in evidence. It is a bound volume and not a loose-leaf record. The entries are in the handwriting of an employee of this firm, were substantially contemporaneous, and made under the supervision of Lorence R. Freadrich, in the ordinary course of the firm's business, and verified by him as being true and correct. In this record one dated page is devoted to each day's business, and the business of consecutive days of the month appear on consecutive pages. As part of the daily entries thus made is noted the presence of the partners and their clerks, together with the amount of business transacted by each. There are no entries for Sundays. This record discloses that on the four days mentioned Charles H. Freadrich was in the store in Lincoln, carrying on the business, and it is to be noted that the aggregate amount of the business transacted by him on the 12th, 13th and 15th days of January, 1912, compares favorably with the records of the others employed therein. The 14th day of January, 1912, was Sunday, and of course no records for this day appear in this statement book, but in the bill of exceptions there is a letter which was written on January 14, 1912, by Lorence R. Freadrich, inclosed in an envelope, postmarked "Lincoln, Nebraska, January 14, 1912," and sent to Chicago, Illinois. In this letter, he says in part:

"This has been a long day. I went to Church with mother this a. m., and Charles and Lulu. We (went) down to dinner and at 3 :00 I went out to Frey's greenhouse."

His recollection being refreshed by this letter, the statement book and other sources of information, Lorence R. Freadrich swears positively that "Charles and Lulu" referred to his brother Charles H. Freadrich and his brother's wife Luella. He further testifies that Charles H. Freadrich was in Lincoln, Nebraska, during January 12, 13, 14, and 15, 1912, and in fact was in Lincoln during the entire month of January, 1912, and could not have been in Galesburg, Illinois, at any time during that period.

It would indeed extend this opinion to an unwarranted length to abstract or set forth verbatim all the proof substantially corroborating these statements. The corroboration is ample, convincing, and complete, and in view of the intrinsic nature of the opposing proof already discussed, we are compelled to the conclusion that the clear preponderance of all the evidence is that Charles H. Freadrich was not in Galesburg, Illinois, on January 12, 13, 14, 15, or 16, 1912, nor indeed at any other time during that month, and that the alleged conversation constituting the basis of plaintiff's claim never occurred. It is obvious, therefore, that the plaintiff in this hearing *de novo* has failed to establish the allegations of her petition by evidence clear, convincing and unequivocal. *Rau v. Rau,* 79 Neb. 694, 113 N. W. 174; *Overlander v. Ware,* 102 Neb. 216, 166 N. W. 611; *Young v. Gillen,* 108 Neb. 311, 187 N. W. 900; *Johnson v. Kern,* 117 Neb. 536, 225 N. W. 38.

It follows that in the findings and decree entered in this cause in favor of the plaintiff, the district court erred.

This judgment of the trial court is, therefore, reversed and the cause dismissed.

REVERSED AND DISMISSED.