ANNA LUNKWITZ, APPELLEE, v. J. P. GUFFEY,
ADMINISTRATOR OF THE ESTATE OF WILHELMIA
LUNKWITZ, DECEASED, ET AL., APPELLANTS.

34 N. W. 2d 256

Filed October 15, 1948.    No. 32403.

*J. G. McIntosh* and *S. S. Diedrichs*, for appellants.

*E. H. Evans*, for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-
MORE, YEAGER, CHAPPELL, and WENKE, JJ.

SIMMONS, C. J.

This is an action for specific performance of an alleged
oral contract for the conveyance of land. The trial
court found that the contract had been made and was
fully performed by plaintiff, and decreed accordingly.

The administrator of the estate of Wilhelmia Lunkwitz, Augusta and Fred Mueller, defendants, appeal. We reverse the judgment of the trial court and dismiss the action.

The plaintiff Anna Lunkwitz is the daughter of Edward and Wilhelmia Lunkwitz. They will be referred to hereinafter as the father and mother. The defendants are the administrator of the estate of the mother; Henry Lunkwitz, son, and brother of the plaintiff; Augusta Mueller, daughter, and sister of the plaintiff; Fred Mueller, husband of Augusta; and Joney Lunkwitz, son of Augusta Mueller, who is joined as a tenant in possession. The children will be referred to hereinafter by their first names.

Plaintiff alleged that the mother died intestate in August 1945, and was the owner of a quarter section of land in Lincoln County; that her father and mother, and particularly the latter, promised and agreed orally, about the time of the acquisition of the land involved in 1917, that "should the plaintiff reside with them and care for them during their respective lifetimes that such property should become the sole property of the plaintiff and that title to such should be transmitted to her by deed or documentary disposition"; that her father was dead (his death, according to the evidence, having occurred in 1937); that her mother lived to be 78 years of age; that "during the last years of her life (she) was physically incapacitated and ill to such an extent as to require daily and constant care and that during all of the years from and after said promise of conveyance had been made the plaintiff remained with her parents in the family home, gave them daily and constant care and attention, and performed the manual work about the lands in question over a number of years and at the home where the parents of the plaintiff resided. * * * and that she cared for her said parents during their lifetime, and did toil in and about the place over all the years, in faithful compliance with her obligations as a

child, and in faithful performance of caring for said parents in compliance with their offer and promise that she should become the sole owner of said lands in question after their respective deaths"; that at various times over the years the mother reiterated her promise and agreement but death overtook her before her promise was consummated; that plaintiff, in "performance of her said obligation and so as to entitle her to the sole and independent title to said property has remained single and unmarried notwithstanding opportunities to wed that she has devoted her entire life and physical efforts to the support and care and attention of her parents and immediate family and that thereby she has fully performed her part of the offer and promise of said parents, and furnished full consideration for the specific performance thereof and * * * that the failure to carry out said agreement would operate as a constructive fraud upon the plaintiff, * * *."

The defendant Henry filed an unverified answer admitting the allegations of the plaintiff's petition and joining in the prayer. The administrator, Augusta, and her husband filed a joint answer denying the allegations material here.

The long-followed rule controlling cases of this character was restated in Overlander v. Ware, 102 Neb. 216, 166 N. W. 611, as follows: "In considering cases of this character, where one is claiming the estate of a person deceased under an alleged oral contract, the evidence of such contract and the terms of it must be clear, satisfactory and unequivocal. Such contracts are on their face void as within the statute of frauds, because not in writing, and, even though proved by clear and satisfactory evidence, they are not enforceable unless there has been such performance as the law requires. The thing done, constituting performance, must be such as is referable solely to the contract sought to be enforced, and not such as might be referable to some other and different contract—something that the claimant would

not have done unless on account of the agreement and with the direct view to its performance—so that nonperformance by the other party would amount to fraud upon him."

This rule has been repeatedly followed and applied down to Riley v. Riley, *ante* p. 176, 33 N. W. 2d 525.

We held in Lintz v. Apking, 145 Neb. 714, 18 N. W. 2d 55, that "The burden in the light of this rule has devolved upon the plaintiff (1) to prove an oral contract the terms of which are clear, satisfactory and unequivocal, and (2) that his acts constituting performance were such as were referable solely to the contract sought to be enforced, and not such as might have been referable to some other or different contract."

Again in Caspers v. Frerichs, 146 Neb. 740, 21 N. W. 2d 513, we held: "Generally in a suit to enforce specific performance of an oral contract embraced within the statute of frauds, the burden is upon the plaintiff to establish two distinct elements by a preponderance of the evidence which must be clear, satisfactory, and unequivocal in character or quality. Those elements are acts of part performance of the contract and the terms of the contract itself."

Each case is to be determined from the facts, circumstances, and conditions as presented therein. Lennox v. Anderson, 140 Neb. 748, 1 N. W. 2d 912.

The Lunkwitz family first lived near McCook where Augusta and then Henry were born. Sometime prior to 1898 they moved to Lincoln County, where they acquired by homestead and otherwise 320 acres of pasture and hay land with some 20 to 40 acres of farm land. There Anna was born in 1898. About 1910, when Augusta was 19 years of age, she gave birth to a son Joney. The family continued to live and work together. In 1914, a house was built on the home place. In 1917, the land involved in this action, about five miles from the home place, was purchased. About 1919, a farm was bought in Keith County. Some eight or nine years later

this land was sold.  Augusta married in 1921.  In 1933, Joney married.  In 1936, the father and mother deeded the home place to Anna by warranty deed, without reservation, for a recited consideration of $1,000.  The deed was recorded the day after execution.

In 1937, the father died at the age of 74 years.  In 1945, the mother died.

This record discloses a family, living and working together in harmony.  The education of the children is not shown with the exception of Henry, who testified to having only a first-grade education.  With the exception of the time of Joney's birth, Augusta worked at home, in the fields, plowing, planting, and harvesting crops, and helping in the heavy labor of the farm not only at the home place but on the land in dispute, until her marriage at the age of 29 years.

Henry lived at home, likewise working on the home place.  It appears that he farmed the Keith County land, or at least lived and worked on that land during the period of its ownership.  After its sale he worked for neighbors and at home.  He became disabled with rheumatism, which progressively became more crippling, and at the time of the trial he was not physically fit for much hard labor.  He was living at home with Anna when this case was tried.

Anna likewise lived at home throughout, working as did the others, slowing up a bit in the later years when the tillable lands of the home place and of the land here involved have been rented.

Joney lived at the home until he was 23 years old.  For the last ten years of that period he worked in the fields doing a man's work.  He farmed the home place in 1932 and 1933 and again from 1941 to 1944 on a share basis, receiving two-thirds of the crop, and his grandmother and Anna one-third and the roughness.  He farmed the land involved in this action from 1931 to 1940, and from 1943 to 1947.  The first two years he

received one-half of the crop and the other years two-thirds of the crop.

It does not appear that any of the children received payment for labor performed. They got their keep. Joney said he trapped for spending money.

Beginning in 1908, the father became ill mentally and physically. He was at home most of the time until his death, doing some work but unable to carry the burdens of work the others performed, and requiring some care, which was rendered by Anna and the mother.

The mother appears to have been an active hard-working woman, both within the home and about the farm. She suffered from rheumatism and stomach trouble, for which she received medical treatment. She had two serious illnesses of a few weeks' duration. But with those exceptions she appears to have continued to work rather persistently until the last weeks of her life. When ill and when she needed to go to the doctor, Anna or Joney provided the care and transportation.

We now come to the evidence upon which plaintiff relies to prove the contract. One witness testified to a statement made by the mother 27 years prior to his testimony. Another testified as to conversations had with the mother two years before his testimony. We are mindful of our statements as to the probative value of such testimony made in Overlander v. Ware, *supra,* and later in Goodwin v. Freadrich, 135 Neb. 203, 280 N. W. 917.

A neighbor exchanging work and helping in the 1920 harvest on the land in question testified that on one occasion there were present at the dinner table the father, the mother, Augusta, Anna, and others. Mention was made of the land recently bought in Keith County and "* * * they said they had a quarter for each one of the girls; one for Anna and one for Gussie. They said: the one we are threshing on, was Anna's and the one south of Roscoe was Gussie's; providing, they werent (sic) married as long as the Old Folks lived."

This cannot be accepted as sufficient proof of the contract under the rule hereinabove stated. Obviously the statement is the conclusion of the witness as to what he remembers. Who said it? The "they" would indicate that both the father and the mother said the same thing in the same words—an obviously improbable occurrence. At best the statement is one of intention. It contains nothing in the nature of a promise, agreement or contract. There was no indication of an agreement on the part of either Anna or Augusta. Augusta testified that she never heard of any such conversation and knew nothing of such an agreement; yet, if there were such an agreement, it applied to both of the girls, and Augusta forfeited her right when she married. Anna testified that she rejected three proposals of marriage in 1925, 1929, and 1933, and that she rejected the proposals because her mother "asked" her to, "She didnt (sic) want me to leave her, she needed me," and she "stayed there at her request." The statement that there was a contract at that time becomes more improbable in view of the fact that not one of the family appears to have heard of it during all the intervening years before the mother's death. Not to be overlooked is the fact that it does not include the elements of the contract which plaintiff alleges, but rather goes to what plaintiff alleged she did in order to enable her to perform the contract alleged.

The other evidence which plaintiff submitted as proof of a contract was conversations which a witness had with the mother a short time before her death. He testified as to several conversations. One of these took place at the home a few months before the mother's final illness. He testified the mother then said, "Everything that is here then is supposed to go to Anna after her death." Again the statement is at best a statement of the witness' understanding, as is demonstrated by the use of the third-person pronoun. But the conversation took place at home. Anna then had a deed to the home place, and as we point out later herein, claimed ownership of the

principal items of personal property then there. The statement makes no direct mention of the land involved in this action.

The witness testified concerning another time when he was at the home visiting with the mother, and a suitor of Anna called. He stated the mother said that one son-in-law was enough, and that there would not be another on the place so long as she lived. Explaining why, she said, "Anna is doing the work, she kept the family going; if it hadnt (sic) been for the girls, I wouldnt (sic) have had enough to eat." He then asked her about making a will and the "properties," and she said she would make a will and "* * * what little is here, the girl is supposed to have." "Anna is supposed to have it." He testified that he discussed the matter again at the hospital a few weeks before her death and the mother said, "* * * there is only one thing that worries me, I havent (sic) made a will." She said that she intended to and "I make the will over to Anna." He testified that he talked with her again the day before her death when she was again at home and she said, "* * * I still am going over my Will. If I should get up, I am going to have Anna bring me to town and I am going to make this Will, what I have got left, in my name, is supposed to go to her."

It is noted that the witness states they discussed "properties." At that time the mother had title to but one piece of land—that involved in this action. It would seem from this and other evidence that she had in mind the home place, which already had been conveyed to Anna. The evidence contains no reference to any words of agreement or promise. Rather, the evidence shows that in her last months and last days, the mother was considering the making of a will and its provisions, and to this witness she revealed her thought that Anna should be the beneficiary of her will. This condition of mind is evidenced by the testimony of other witnesses. One witness testified that some two years before her death the mother told her she did not have a will and

that "There was only three heirs and there will be no trouble"—a not unnatural statement in view of the harmony that then appeared to exist among the children. Other witnesses testified that during the later months of her life, the mother told them that Anna had had enough and expressed a desire that Henry and Joney have the land in dispute. That disposition could only be made by will. The evidence does not disclose any thought in the mind of the mother that the disposition of this property had long since been determined by a binding agreement. Rather it discloses a disturbed mind as to how it should be done by will. If that question was finally determined in her mind it was not consummated by the execution of a will. That act cannot be done by the courts.

The proof as to the alleged contract does not meet the test as to quality of being clear, satisfactory, and unequivocal that the rule requires.

But plaintiff argues that any deficiency in the direct proof of the contract is supplied by the evidence of full performance of the contract on her part. We go then to the sufficiency of proof of performance under the rule.

The evidence establishes that plaintiff lived with and served her parents, cared for them, and worked long and hard. Is that evidence such as is referable solely to the contract sought to be enforced, something that the plaintiff would not have done unless on account of the agreement and with the direct view to its performance? We think not. The services rendered and care given were identical in kind to those rendered by plaintiff before the time of the alleged contract and those rendered by Augusta, Henry, and Joney both before and after the alleged contract was made, and without reference to any such contract or agreement.

Plaintiff likewise contends that the services performed were full consideration for the specific performance, and

that the failure to carry out the contract would operate as a constructive fraud upon her.

It is clear from the evidence that whatever property the father and mother acquired was accumulated by their joint efforts, together with those of the children, including Joney. At the time Augusta married and left home, the father and mother had the three farms free of debt, and personal property for their operation. The record indicates that the proceeds of the sale of the Keith County land went to the use of the family, excluding Augusta. Anna testified that the father and mother sold her the home place because they needed money; that she paid them $500 by check in 1934, $300 in 1935, and $200 in 1936; and that she took receipts for the money. She was asked about the receipts and the check and testified that they were lost. She also was asked to produce bank records showing the transaction and apparently made no effort to do so. On cross-examination, inquiry was made as to what "happened" to that money. She testified that "* * * she had places to pay out, I believe it was some here in Court and she gave some of it to Joney, for his funeral of his wife, and she gave him the money to buy a horse, and she gave him a good start, and she gave him money to buy a new Chevrolet car, and different second-hand cars"; and later "They were needing some to live on it." The $1,000 received from 1934 to 1936 was well spread out if so paid and spent. Was it so spent? The record contains evidence that in 1931 the mother paid for Joney a fine and possibly attorney fees on an illegal liquor sale matter. No other such event is shown in the record. Joney testified that the mother did not buy him a car; that he bought one in 1931; and that the mother did not pay for it. That was the year Joney was engaged in the illegal liquor business, on his own account according to Anna, and on the joint account of Anna and the mother, according to Joney. These events occurred three years before the first payment by Anna to her parents

is claimed to have been made. Joney testified that the mother did not buy him any farm equipment, and he testifies where he bought it. It is undisputed that he was farming on his own account in 1933, a year before the first payment is claimed to have been made. Joney's wife died. There is no showing as to who paid the funeral expense, but the death occurred in 1939, three years after the last payment of $200 is claimed to have been made.

Assuming that Anna paid the $1,000 for the deed to the home place, then we have the situation that the father and mother were in need of money in the depression years of 1934, 1935, and 1936, and that Anna, living and working with them, had money in reserve and exacted land in return for it. Whatever money Anna had, she secured as a result of her operations on the farms of her parents. No other source of income is suggested. There is undisputed evidence that the mother on several occasions through the years had considerable money about her person and the home, or, as one witness put it, she always had money. She had money "out" in 1943, represented by a promissory note, the collection of which was disturbing her. Anna testified that the mother had no money at the time of her death. During those last years the land involved in this action was rented and producing a return to the owner. Anna claimed ownership of the car and from one answer indicated a claim of ownership to all the personal property except her mother's "belongings."

The evidence shows that the father and mother owned cattle in the earlier years. Anna testified that some 30 years or more ago her mother gave her a heifer calf; that she kept her cattle unbranded; that by 1936, the father and mother owned no cattle and, as Anna stated, "At last, they were all mine"; yet they were raised and fed on the land of the father and mother. There is one reference to feed being purchased, the years not being shown. At the time of the trial Anna had a herd of 27

cattle. The mother was penniless, save for the land involved in this action.

It appears that Anna had collected her compensation as the years have progressed, and considering the economic status of the family, has been well paid, at least by contrast with that which the others received. To deny her petition does not mean that the plaintiff's work and services go unpaid.

We hold that the plaintiff has failed to prove the second element, namely, performance—within the rule.

It is unnecessary to consider plaintiff's cross-appeal as to the taxation of costs in the trial court.

The judgment of the trial court is reversed and the cause dismissed.

REVERSED AND DISMISSED.