HENRY L. CASPER ET AL., APPELLANTS, v. JERRY W. FREY, ADMINISTRATOR OF THE ESTATE OF CATHERINE OELTING, DECEASED, ET AL., APPELLEES.

41 N. W. 2d 363

Filed February 24, 1950. No. 32720.

*Lloyd E. Chapman,* for appellants.

*William L. Walker, Earl Ludlam,* and *Leonard Dunker,* for appellee Jerry W. Frey.

*Wagener & Ronin,* for appellee State of Nebraska.

*Merril R. Reller,* for appellee Grace Frey.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

Plaintiffs brought this action for specific performance of an oral contract to devise real property. Issues were made and trial was had. At the close of plaintiffs' evidence, the trial court sustained a motion to dismiss. Plaintiffs appeal. We affirm the judgment of the trial court.

The plaintiffs in this action are Henry L. and Ida J. Casper. The defendants are Jerry W. Frey, administrator of the estate of Catherine Oelting, deceased, and the State of Nebraska. The State is made a party on the premise that unless the contract alleged is performed, the property will escheat to it.

Plaintiffs do not allege the date when the alleged contract was made. By limits fixed within the allegations it occurred sometime after May 1942, and prior to the latter part of May 1943. Plaintiffs allege the status of the parties, the basis of the acquaintance, their tenancy in property of Mrs. Oelting, and services rendered Mr. and Mrs. Oelting beginning in May 1942. Plaintiffs further allege that Mrs. Oelting orally promised plaintiffs that if they would continue to perform such services for her

as she might request from time to time during the remainder of the life of her husband and herself, she would leave them all her property at her death; that plaintiffs accepted the proposal and agreed so to do, and thereafter performed in reliance on the promise and agreement of Mrs. Oelting; and that Mrs. Oelting never completed the execution of a will. Plaintiffs prayed for specific performance and for equitable relief.

So far as material to the issues for determination here, the administrator, herein referred to as the defendant, denied generally, and prayed for a dismissal of the plaintiffs' petition and a quieting of the title.

Grace Frey, otherwise identified in the pleadings as a daughter of Mr. Oelting and the wife of defendant, intervened, denied generally, and prayed for affirmative relief by way of a cross-petition. The issues so raised are not material to our decision of the questions presented by this appeal.

The State filed a general denial.

Plaintiffs replied.

The cause went to trial. At the close of plaintiffs' evidence, the defendant moved for a dismissal of plaintiffs' petition for failure of sufficient proof. The motion was sustained. A motion for a new trial was made and overruled.

The rules applicable to cases of this character were restated in Lunkwitz v. Guffey, 150 Neb. 247, 34 N. W. 2d 256, as follows: "Where one is claiming the estate of a person deceased under an alleged oral contract, the evidence of such contract and the terms of it must be clear, satisfactory and unequivocal. * * * Such contracts are on their face void as within the statute of frauds, because not in writing, and, even though proved by clear and satisfactory evidence, they are not enforceable unless there has been such performance as the law requires. * * * The thing done, constituting performance, must be such as is referable solely to the contract sought to be enforced, and not such as might be referable to some

other and different contract—something that the claim-
ant would not have done unless on account of the agree-
ment and with the direct view to its performance—so
that nonperformance by the other party would amount
to fraud upon him. * * * The burden in the light of this
rule has devolved upon the plaintiff (1) to prove an oral
contract the terms of which are clear, satisfactory and
unequivocal, and (2) that his acts constituting perform-
ance were such as were referable solely to the contract
sought to be enforced, and not such as might have been
referable to some other or different contract. * * * Each
case is to be determined from the facts, circumstances,
and conditions as presented therein." See, also, Jenkins
v. Jenkins, 151 Neb. 113, 36 N. W. 2d 637.

The case comes to this court for trial de novo subject
to the rule that " 'When defendant moves to dismiss
plaintiff's action at the close of plaintiff's evidence, the
defendant thereupon admits the plaintiff's testimony to
be true, together with every conclusion which may fairly
and reasonably be drawn therefrom.

" 'The court must thereupon determine, as a question
of law, whether plaintiff's evidence is sufficient to sup-
port a judgment for the plaintiff.' " Meyer v. Platt, 137
Neb. 714, 291 N. W. 86. See, also, Schroeder v. Bartlett,
129 Neb. 645, 262 N. W. 447; Lucas v. Lucas, 138 Neb.
252, 292 N. W. 729; Caspers v. Frerichs, 146 Neb. 740, 21
N. W. 2d 513.

The record shows that Mrs. Oelting received title to the
property here involved by warranty deed on May 5,
1924; that by warranty deed dated February 8, 1935, and
filed July 16, 1935, Mrs. Oelting and her husband con-
veyed it to the Nebraska Central Building and Loan
Association; and that that grantee conveyed it to Mrs.
Oelting by warranty deed dated July 26, 1946, and filed
July 30, 1946, the conveyance being "Subject to all liens
of every nature that have arisen since October 5, 1936,"
and to taxes for 1936 and thereafter.

Plaintiffs' evidence was given by a son of Mrs. Casper,

his wife, a daughter of the plaintiffs, and by a long-time family friend of plaintiffs and particularly of the daughter. Where necessary they will be referred to herein as the son, daughter-in-law, daughter, and friend, and where necessary the plaintiffs will be referred to as Mr. or Mrs. Casper.

The evidence is that the property here involved included a duplex, the north half of which had five rooms. The evidence refers to the property as 2434 and 2436 South 10th Street. In May of 1942, the Oeltings lived in the south half of the duplex. At that time the plaintiffs rented the north half for $15 a month, moved in and resided there, paying rent, until June 30, 1943, when they moved to 920 South 15th Street, where they have since resided. During the early part of this tenancy the son, his wife, and family, and the daughter and her child lived for about two weeks with the plaintiffs in the duplex. Thereafter they moved to other addresses in Lincoln. Prior to the tenancy the plaintiffs, their family, and the friend had not been acquainted with the Oeltings. The acquaintance began under those circumstances.

In 1942, Mrs. Oelting was 63 years of age and her husband some 20 years older. Mrs. Oelting was in good health for a woman of her years. Mr. Oelting was in poor health. In the spring of 1943, he underwent a serious operation and was in the hospital for some weeks. Thereafter his health deteriorated so that he became progressively less able to care for himself and he lost control of his bodily functions so that he required the care and attention given to a baby. He died January 16, 1948. Mrs. Oelting became seriously ill in 1948, was in the hospital on two occasions, and died November 14, 1948.

The evidence is that when the plaintiffs lived in the property and after they moved from the duplex, they responded to calls on many occasions for service by Mrs. Oelting and did many things for her and Mr. Oelting, such as cleaning out the furnace and ashes, repairing

electrical attachments and a washing machine, mowing the lawn, assisting in the laundry work, and giving food and delicacies to the Oeltings. The evidence is that they gave Mrs. Oelting some of their used clothing and acquired clothing for her at the Salvation Army and Goodwill Industries, and at one time bought a second-hand electric iron at $1.25 to replace one worn out, and also secured an electric washing machine for her. Thereafter on many occasions the parties visited in each others. homes and in the homes of plaintiffs' children throughout the period covered by this testimony.

The plaintiffs and other members of their family assisted during the periods that the Oeltings were in the hospital. Upon Mr. Oelting's death they helped clean up the house, put articles of furnishings therein, and rendered like services. There is no dispute that these services were rendered and that they were appreciated by Mrs. Oelting. The evidence also is that after Mrs. Oelting's death, Mrs. Casper removed "rags" from the Oelting home and apparently possessed and retained the "electric machine." For reasons appearing hereinafter we do not deem it necessary further to detail this evidence.

We go now to the evidence offered to establish the alleged agreement.

We find no evidence of anyone who claimed to know of the agreement as to when, where, or under what specific circumstances it was made. The testimony of the son is that in May 1943, at his home and in the presence of the witness, his wife, and his daughter, Mrs. Oelting said "* * * the folks had been so good to her and helped her in all their sickness (at that time there is no illness of Mrs. Oelting shown) and we, too, had been so good to her, myself and my wife and she said she didn't have any way to repay us for our kindness but she made an agreement with my folks to leave her property to them when she died," and that was all she said. The daughter-in-law testified as to that time that "Mrs.

Oelting said she had made an oral agreement with the Caspers to give them her property."

If there were such a contract as alleged in existence at that time, then we have the rather unusual situation of the plaintiffs shortly thereafter moving out of the property they now claim was to be theirs, and putting themselves where it would be difficult, if not impossible in part, for them to perform the contract. Be that as it may, we have searched this record for evidence of an agreement on the part of the plaintiffs to perform services in return for the promised disposition of the property. As we said in Goodlett v. Banning, 127 Neb. 325, 255 N. W. 9, without the plaintiffs' petition, the record would not disclose what the terms of the contract were which it was claimed existed so far as required performance on the part of the plaintiffs is concerned. The above evidence does not show what the terms of the contract were, much less show it clearly, satisfactorily, and unequivocally.

There is other evidence as to statements made by Mrs. Oelting as to the existence of a contract. They occurred in 1948. Mr. Oelting died January 16, 1948. His body was taken to a mortuary. The daughter-in-law testified that at the mortuary on January 17, 1948, "Mrs. Oelting didn't want Mr. Oelting to have a county funeral and she didn't have enough money to go ahead with a different funeral herself so Mrs. Casper advanced her $100.00 so she could have a funeral other than a county funeral." The same day Mrs. Oelting, Mrs. Casper, the son, the daughter-in-law, and the daughter were together at the son's home at noontime. Mrs. Oelting talked about her husband's funeral. The son testified that she said: " 'My, you folks have been like my own kin folks to me, couldn't be better if you was. You helped me in my time of need when Frank died', she says, 'I didn't have anything. You help me out, you take me in here and feed me and bring me down', and she says, 'I am sure glad I made an agreement to give you folks my property when

I die'." (We note the past tense "You helped me * * * when Frank died.")   The daughter-in-law testified that "Mrs. Oelting began crying after she had eaten and she says, 'I am so grateful.   Without the Caspers I couldn't have gave Frank a burial as we are now if it hadn't been for Mrs. Casper.   I don't have any money or anything to give her now but I am going to make a will and give them my property'."   "She said, 'They have performed so many duties for me and bought me clothes and food and always came to my assistance when I called them that they are surely deserving of it'."   And "* * * she had been crying and said she couldn't have given Frank a decent funeral if Mrs. Casper hadn't helped her pay it."

But what agreement was being discussed at this time? The friend testifies that the week after Mr. Oelting's funeral she visited with Mrs. Oelting at the Casper home; that they were talking about the funeral; and that Mrs. Oelting "* * * told me she did want a burial just like Frank had and Mrs. Casper had agreed that she should have that kind of burial" and "She said * * * she had made an agreement with them or she had told them that she would see that they got her property * * *." Obviously the agreement that Mrs. Oelting was talking about in these conversations was not the alleged agreement upon which this action is based.

The evidence is that Mrs. Oelting, Mrs. Casper, and the daughter all had birthdays in April.   They had a birthday party April 20, 1948, as a surprise to Mrs. Oelting. The daughter and mother exchanged gifts and gave gifts to Mrs. Oelting.   The daughter-in-law testified that Mrs. Oelting said, "* * * 'I don't have much to give and you know that but I want the Caspers to have my property and I am going to make a will giving it to them'."   The son corroborated this testimony.   The daughter-in-law testified that "She was so grateful because we all gave her a gift and that led up and she said was going to make a will to give her property to the Caspers because she didn't have any money to give her anything then."

On Mother's Day in 1948, Mrs. Oelting stopped at the home of the plaintiffs on her way to the cemetery to visit Mr. Oelting's grave. The son testified that on that occasion they were visiting and Mrs. Oelting said, "* * * 'I am sure going to see that you have my property', * * *." and that she "* * * didn't say anything about agreement at that time * * *." The daughter testified that on this occasion Mrs. Oelting said "* * * the folks had always been so good to her that she was going to leave them the place as they had agreed." And later, "She said the folks had been so good to her she wanted to leave the place to them if she could."

There is evidence that in July of 1948, Mrs. Oelting told the daughter that "* * * she was going to leave the property as she had agreed to and that she wanted them to have it."

There are other references in the testimony to statements about an agreement that were repeated almost every time Mrs. Oelting visited with one witness and "hundreds and hundreds" of times with another. We do not deem it necessary further to set out that evidence.

After Mrs. Oelting's death the daughter rented the south half of the duplex from the defendant under an agreement to pick up and store everything. On December 8, 1948, when going through a buffet, she found a paper in the drawer, among old purses, hats, "junk," and papers. The one sheet was produced and offered by plaintiffs as an admission, "* * * the same as if she said it only much stronger." The evidence is that it is in Mrs. Oelting's handwriting. It is as follows: "Last Will of Catherine Pauline Oelting. This is to certify that I Catherine Pauline Oelting being of sound mind have made this will as follows. Since I am an Old age Assistance recipient, they have a lien on my property. But after they have taken, what is permitted by law, since Sept 7, 1947, the rest of the property, should go to Mr. Henry and Mrs. Ida Casper providing they guarantee, to the Mortician Mr. Wadlow, to pay for my funeral, just

like my husband had, and Dr. Gerald Kennedy officiating. I dont (sic) want to be buried by the County and Mr. & Mrs. Casper have agreed to pay for it, providing they get the property which ought to be worth about $6000 at this time My lot in Wyuka is paid for, and I want to be laid beside my dear husband. The Caspers have been to me unselfish friends and have helped me and stood by my (sic) during the last 6 years of my desperate struggle with my sick husband." It is not dated or signed. Obviously it was written after September 7, 1947, and from the last sentence it is a reasonable inference that it was written in 1948 after Mr. Oelting's death. What does it admit? It is not an admission of any agreement such as plaintiffs plead and contend for here. It is entirely silent as to any agreement of that character. It obviously refers to an entirely different subject matter. It corroborates the testimony of the friend and the inferences from the testimony of the son and daughter as to the subject matter of the discussions beginning with January 17, 1948, and negatives any conclusion that the testimony which the witnesses gave relates in any way to the purported agreement upon which the plaintiffs base their cause.

It follows that plaintiffs have failed to establish the contract which they pleaded. It is not necessary and we do not determine whether or not the writing and the evidence establishes an enforceable contract otherwise. It is not within the issues here and there is no evidence of performance of the conditions attached.

One further matter may be mentioned. The rule is that the things done must be such as are referable solely to the contract sought to be enforced. At no place in this evidence do we find any contention that the things done are referable solely to the contract alleged. The evidence negatives it. The son testified that Mrs. Casper told the Oeltings that she did not expect anything for what she had done; that his mother would treat anyone with the same kindness as she had shown them; and that on the

occasion of the birthday party Mrs. Casper told Mrs. Oelting "* * * 'We don't expect any gifts from you, we never have'."

Without further discussing the evidence we find that plaintiffs have failed to prove the contract alleged and have failed to prove the performance required by the law of this state.

The judgment of the district court is affirmed.

AFFIRMED.